**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

MAURICE TYLER,                                   )
                                                 )
    Petitioner,                              )          Case No. 3:10-1187
                                                 )          Chief Judge Haynes
v.                                               )
                                                 )
HENRY STEWARD, Warden, et al.,                   )
                                                 )
    Respondents.                             )

## SECOND AMENDED MEMORANDUM

Petitioner, Maurice Tyler, filed this action under 28 U.S.C. § 2254 seeking the writ of habeas

corpus to set aside his two convictions for first degree murder for which Petitioner received a life

sentence. After a review of the petition, the Court appointed the Federal Public Defender who filed

an amended petition through counsel and incorporated the claims in the pro se petition.[1]  In his

amended petition, Petitioner asserts the following claims:

(1). Trial counsel failed to request a jury visit to the site of the shooting at
the time of the shooting;

(2). Trial counsel failed to present key witnesses to bolster the proof
regarding the guilt of Christopher Schultz;

(3). Trial counsel failed to investigate and inquire into the exact nature of
Petitioner's alleged threat to Mr. Campbell;

(4). Trial counsel failed to move for a mistrial after prejudicial remarks from

---

[1]Rule 15 of the Federal Rules of Civil Procedure applies to a habeas proceeding. Mayle v.
Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R.
Civ. P. 15 (a), the filing of an amended complaint supersedes the prior complaint. Clark v.
Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended
petition to supersede the pro se petition and the claims therein. Unless adopted and supported by
legal authorities, the Court deems the claims in the pro se petition to be waived.

1

the prosecution in closing argument;

(5) Trial counsel failed to object to jury instructions that lowered the burden of proof to well below "beyond a reasonable doubt";

(6). Had defense counsel not failed to take the above actions, there is a reasonable probability that the jury would have reached a "not guilty" verdict;

(7) In violation of the Fourteenth Amendment to the United States Constitution, the jury instructions violated Mr. Tyler's right to due process under the law and conviction beyond a reasonable doubt;

(8) In violation of the Fifth, Sixth, and Fourteenth Amendments, the State's improper comments during closing argument violated petitioner's right to a fair trial and his right against self-incrimination; and

(9) In violation of the Sixth and Fourteenth Amendments, Mr. Tyler was denied his right to a fair trial and impartial jury when the court admitted detailed graphic photographs of one victim found at the scene of the crime.

(Docket Entry No. 14, Amended Petition at 19-29).

In his answer, Respondent asserts that the claims in the pro se and amended petitions are time barred under the federal habeas statute of limitations. Respondent contends that Petitioner's claims in his amended petition lack a common nucleus of facts to the claims in the pro se petition and cannot relate back to render those claims timely. (Docket Entry No. 17). To the extent Petitioner's claims in his pro se petition are timely, Respondent asserts that the state courts reasonably decided those claims under clearly established federal law. Id.

## A. Procedural History

A jury convicted Petitioner of two first degree murders for which Petitioner received an effective life sentence. State v. Tyler, No. M2005-500-CCA-R3-CD, 2006 WL 264631 (Tenn. Ct. Crim. App. Feb. 1, 2006). On appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's

convictions and sentence. Id. On June 26, 2006, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id.

On June 18, 2007, Petitioner filed a state post-conviction petition for which the state trial court appointed counsel. After an evidentiary hearing, the state trial court denied the petition and on appeal, the Tennessee Court of Criminal Appeals affirmed. Tyler v. State, No. M2008-02199-CCA-R3-PC, 2010 WL 2025459 (Tenn. Ct. Crim. App. May 21, 2010). On August 26, 2010, the Tennessee Supreme Court denied the Petitioner's subsequent application for permission to appeal.

On December 9, 2010, Petitioner filed his pro se petition in this action. Petitioner amended his petition on April 25, 2013. (Docket Entry No. 14).

### B. The Statute of Limitations Defense

The Court addresses first the Respondent's timeliness challenge that could render consideration of Petitioner's substantive claims moot or reduce the number of actionable claims. Respondent also contends that only claims 1, 3 and 5 in Petitioner's amended petition are timely and the remainder are time barred and do not relate back to the original filing date because they did not arise out of the "same conduct, transaction or occurrence" in the original petition. (Docket Entry No. 17, Answer at 2).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") that became effective on April 24, 1996, set a one year limitations period for habeas corpus actions. Under 28 U.S.C. § 2244(d)(1), a person convicted in state court has one (1) year from the time the conviction becomes final on direct appeal to file a federal petition. In Lindh v. Murphy, 521 U.S. 32 (1997), the Supreme Court held that the AEDPA was to be applied prospectively, i.e., beginning after April 24, 1996. In Brown v. O'Dea, 187 F.3d 572, 576-77 (6th Cir. 1999), the Sixth Circuit set a one year grace period

3

from the Act's passage, i.e., midnight of April 23, 1997, for the filing of habeas petitions for state prisoners whose convictions were final. Accord Martin v. Jones, 969 F.Supp. 1058, 1061 (M.D. Tenn. 1997). Yet, where a federal habeas action is stayed pending exhaustion of state court remedies, the federal limitations period is tolled. Palmer v. Carlton, 276 F.3d 777, 781 (6th Cir. 2002). Aside from the "stay and abeyance" rule, the federal limitations period can be equitably tolled under the Court's equitable jurisdiction. Souter v. Jones, 395 F.3d 577, 599-600 (6th Cir. 2005).

In addition, under 28 U.S.C. § 2244(d)(2), "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations under this subsection." Id. (emphasis added). "The [statutory] tolling provision does not, however, 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations." Vroman v. Brigano, 346 F.3d 598, 602 (6th Cir. 2003) (quoting Rashid v. Khulmann, 991 F.Supp. 254, 259 (S.D.N.Y.1998)). "[A]n application for post-conviction relief is 'properly filed' within the meaning of § 2244(d)(2) 'when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, ... the time limits upon its delivery.'" Id at 603 (quoting Artuz v. Bennett, 531 U.S. 4, 8 (2000)).

The pendency of a federal habeas action does not toll the limitation period for filing of a federal habeas claim. Duncan v. Walker, 533 U.S. 167, 181-82 (2001). Under certain conditions, the relation back doctrine under Fed. R. Civ. P. 15(c)(2) can apply in a federal habeas action, but only to the extent that its application does not conflict with the AEDPA limitation period and the

4

challenged claim is tied to the facts alleged in the original petition. Mayle v. Felix, 545 U.S. 644, 649 (2005). As the Supreme Court stated in Mayle:

> An amended habeas petition, we hold, does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.
>
> * * *
>
> Habeas Corpus Rule 11 permits application of the Federal Rules of Civil Procedure in habeas cases "to the extent that [the civil rules] are not inconsistent with any statutory provisions or [the habeas] rules..." Section 2242 specifically provides that habeas applications "may be amended ... as provided in the rules of procedure applicable to civil actions."
>
> * * *
>
> If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance.
>
> * * *
>
> **So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order.**

Id. at 650, 654, 662, 664 (emphasis added).

On June 26, 2006, the Tennessee Supreme Court denied Petitioner's application for permission to appeal on Petitioner's direct appeal. Under 28 U.S.C. § 2244(d)(1)(A), Petitioner's state court conviction "became final" on September 30, 2006, upon conclusion of his direct appeal and the expiration of ninety days to seek the writ of certiorari in the United States Supreme Court on direct appeal. See Clay v. United States, 537 U.S. 522, 527-28 (2003). Under § 2244(d)(1)(A), Petitioner had one year thereafter to file this action. On June 18, 2007, Petitioner filed his state post conviction petition and by that time 266 days of the federal

limitations period had expired. On June 18th, the federal habeas statute of limitation was tolled. 28 U.S.C. § 2244(d)(2). On August 26, 2010, the Tennessee Supreme Court denied Petitioner's application for review on his post-conviction appeal. Given the prior time periods, the federal habeas limitations period restarted and expired on December 3, 2010. Petitioner submitted his petition in this action to the prison mail room on December 9, 2010. On April 25, 2013, Petitioner amended his petition. (Docket Entry No. 14).

For this six day delay in filing this action, Petitioner alleges a shutdown at his assigned facility, but does not present proof for this assertion. Yet, as discussed infra, based upon witness Jonathan Wing's testimony and in light of the other evidence at Petitioner's trial, the Court concludes that Petitioner has made a sufficient showing of actual innocence to overcome his six day delay beyond the AEDPA's one-year statute of limitations. McQuiggin v. Perkins, 133 S.Ct. 1924, 1931 (2013) (characterizing the petitioner's claim as seeking "an equitable *exception* to § 2244(d)(1), not an extension of the time statutorily prescribed," the Supreme Court explained, "[i]n other words, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief.") (emphasis in original); Phillips v. United States, 734 F.3d 573, 581 n.7 (6th Cir. 2013) (discussing whether an actual innocence claim is more appropriately construed as seeking equitable tolling or an equitable exception to the statutory bar); Souter v. Jones, 395 F.3d 577, 588-90 (6th Cir.2005) (equitably tolling the AEDPA's one year statute of limitations based upon a credible claim of actual innocence).

As to whether the claims in Petitioner's amended petition relate back to the filing of his original petition, the relevant inquiry is whether the new claims sprung from the same facts as did

6

the original claims. Mayle, 544 U.S. at 664. Petitioner's pro se petition is difficult to follow. In

his supporting pro se brief, Petitioner asserted the following ineffective assistance of counsel

claims:

> 1.    WHETHER PETITIONER TRIAL COUNSEL RENDER INEFFECTIVE
> ASSISTANCE OF COUNSEL BY MAKING A UNILATERAL DECISION ON
> PETITIONER"S BEHALF THAT HE WOULD NOT TESTIFY, IN VIOLATION
> OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENT OF THE
> UNITED STATES CONSTITUTION.
>
> 2.    WHETHER COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF
> COUNSEL FOR FAILING TO ADEQUATELY INVESTIGATE, INTERVIEW
> THE WHEREABOUT OF MR. SHANNON, BEFORE HIS DEATH.
>
> 3.    COUNSEL FAILURE TO INTERVIEW AND SUBPOENA
> DEFENDANT MOTHER MRS. PENELOPE TAFOYA, DETECTIVE
> PUTNAM AND SEVERAL PRISON EMPLOYEES WHO WORK'S AT THE
> PRISON WHERE CHRISTOPHER SCHULTZ WAS HOUSED BEFORE
> TRIAL.
>
> 4.    WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR NOT
> OBJECTING TO OFFICER CHRIS STEELE FOR TESTIFYING REGARDING
> ALLEGED STATEMENT MADE THREE YEARS PRIOR TO PETITIONER
> TRIAL.
>
> 5.    WHETHER TRIAL COUNSEL WAS INEFFECTIVE BASED ON
> COUNSEL'S FAIL TO RAISE THE AFFIDAVIT MISREPRESENTATION OF
> MATERIAL FACTS ON DIRECT APPEAL

(Docket Entry No. 2 at 5). Petitioner asserted facts specific to each claim, id. at 8, 9, 11, 12-13

and 14-15, and only identified the following witnesses whom his trial counsel failed to call, Mr.

Shannon, Mrs. Tafoya and Detective Brad Putnam. Id. at 8 and 11. Petitioner mentioned "several

prison employees", but did not provide any names. Petitioner cited his counsel's failure to

impeach Detective Steele. Id. at 12.

Except for the claims related to these factual allegations, the Court deems the other

7

claims in the amended petition to be untimely filed even though some claims were presented to the State courts. Specifically, the Court concludes that the following claims are time barred:

> Claim (1) that trial counsel failed to request a jury visit to the site of the shooting at the time of the shooting;
>
> Claim (4) that trial counsel failed to move for a mistrial after prejudicial remarks from the prosecution in closing argument;
>
> Claim (5) that trial counsel failed to object to jury instructions that lowered the burden of proof to well below "beyond a reasonable doubt";
>
> Claim (6). That without defense counsel's failure to take the above actions, there is a reasonable probability that the jury would have reached a "not guilty" verdict;
>
> Claim (7) that the jury instructions violated Mr. Tyler's right to due process under the law and conviction beyond a reasonable doubt;
>
> Claim (8), the State's improper comments during closing argument violated petitioner's right to a fair trial and his right against self-incrimination in violation of the Fifth, Sixth, and Fourteenth Amendments; and
>
> Claim (9) that Petitioner was denied his right to a fair trial and impartial jury when the court admitted detailed graphic photographs of one victim found at the scene of the crime in violation of the Sixth and Fourteenth Amendments.

See Docket Entry No. 14, Amended Petition at 19-29. Thus, the Court now addresses Claims 2 and 3 in the second amended petition, including subparts of these claims that share common factual ties to Petitioner's pro se petition such as Detective Putnam who was not called as a defense witness.

8

## C. Review of the State Record

On Petitioner's post-conviction appeal, the Tennessee Court of Criminal Appeals made extensive findings of the facts[2] underlying Petitioner's convictions.

> The convictions at issue in this appeal stem from an apparent revenge killing in which the Defendant, Maurice Darnell Tyler, fired twenty-eight shots into a vehicle parked outside the Outer Limits night club in Nashville during the early morning hours of November 25, 2002. The occupants of the vehicle, victims Cayra Caruth and Monte Campbell, were killed. Based on eye-witness accounts, the Defendant was deemed a suspect and a warrant was issued for his arrest. After receiving attention in the news media, the Defendant turned himself in. In March of 2003, he and his co-defendant, Christopher Schultz, were indicted by a Davidson County grand jury on two counts of first degree premeditated murder and one count of felony murder. See Tenn. Code Ann. § 39–13–202(a)(1) and (a)(2). Mr. Schultz entered guilty pleas, and the Defendant elected to go to trial.
>
> At trial, the State's leading witness, Mr. Jared Johnson, testified that on the night of the murders he was employed as the night manager for the Outer Limit night club in Nashville. At approximately 2:30 on the morning of November 25, 2002, he was standing outside the club when he first heard multiple gunshots, then saw muzzle fire, and subsequently witnessed a man shooting into the passenger side of a silver Mercury Cougar parked in an adjacent parking lot.FN1 Mr. Johnson recalled initially thinking he was witnessing an act of vandalism because he could not see the victims laying in the car and because the shooter "looked pretty calm" as he shot, reloaded, shot some more, and then casually walked to a waiting car which drove off.
>
>> FN1. While Mr. Johnson initially reported to the police that the shooter got into the driver's side of the car, upon further reflection, he realized it was the passenger's side, and he called the detective in charge and amended his statement to reflect the shooter entering the passenger side of the get-away vehicle.
>
> According to Mr. Johnson's testimony, the shooter entered the passenger side of a black, four-door Saturn driven by another man, and the two fled the scene. Mr. Johnson followed the car in his own vehicle. During a rather lengthy and often high-speed chase, Mr. Johnson placed a call on his cellular phone to the 911 dispatcher to report the crime and also video taped much of the pursuit. FN2 Mr. Johnson eventually broke-off his pursuit when the fleeing suspects entered a small side-street in Antioch, which he feared may have been a

---

[2]State appellate court opinion findings can constitute factual findings in a habeas action, Sumner v. Mata, 449 U.S. 539, 546-47 (1981), and have a statutory presumption of correctness. 28 U.S.C. § 2254(e).

dead-end. However, during the chase he obtained the license plate number of the Saturn. He also saw the shooter's face on two occasions; once at the very beginning of the chase when the shooter turned around in the passenger seat and looked directly at him, and once again mid-way through the pursuit when Mr. Johnson pulled up alongside the passenger's side of the Saturn on Interstate 24 and "got another good look at the shooter."

> FN2. The record reveals that Mr. Johnson was an amateur videographer who often kept a video camera in his vehicle. The video of the pursuit, taped through the front windshield of Mr. Johnson's vehicle as he followed the shooter fleeing from the crime scene, was entered into evidence and played for the jury.

After he terminated the pursuit, Mr. Johnson returned to the Outer Limit and reported to the police, who were already on the scene. He described the shooter as a light-complected Hispanic or African–American male with short, black hair, pointed ears, approximately five feet eight or nine inches tall, and wearing a black jacket. He further informed the police that he remembered seeing the same man hanging around the parking lot before the shooting. Later, when Mr. Johnson saw the Defendant's photo in the news media as one of several suspects involved in the case, he immediately called the police and identified the Defendant as the shooter. On cross-examination, Mr. Johnson admitted that he never saw the driver of the get-away vehicle.

Ms. Tashiba Hazelitt testified that she had been friends with victim Cayra Caruth for fifteen or sixteen years and had known victim Monte Campbell for six or seven years. The night of the shooting, she and Ms. Caruth met Mr. Campbell at the Outer Limit. Ms. Hazelitt further testified that she observed the Defendant walk by her and the victims "at least three times" that night with his hand in his pocket, looking at them. Later, Ms. Caruth and Mr. Campbell left the club and went outside. The shooting occurred shortly thereafter. Mr. Hazelitt also stated that when the Defendant's photograph was shown on television she immediately recognized him as the man who walked by her and the victims several times, and she contacted the police to report this information.

Ms. Quaneisheia Wiggins testified that on the night of the murders she and several friends were standing in the parking lot of the night club and witnessed the shooting. She observed a man shoot into the passenger side window of a car, stop, bend down, then continue to shoot more, and eventually flee in a black, four-door Saturn. She testified that she saw only the side profile of the shooter, but could tell that he had black hair and a "dark complexion." Ms. Wiggins further explained the shooter's skin color was darker than that of the Assistant District Attorney presenting the State's case, whom she described as "white," but lighter than her own complexion, concluding: "he could have been [H]ispanic. He could have been mixed. He could have been yellow." On cross-examination, Ms. Wiggins denied she initially reported to the police that the shooter was white, insisting she said he was "light-complected." A video tape of Ms. Wiggins' interview with the police, conducted the same night the murders occurred, was played for the jury. In this video Ms. Wiggins clearly

described the shooter as a "white guy."

Detective Johnny Ray Crumby, Jr., of the Nashville Police Homicide Division, testified that he was the lead detective in this case, and upon his arrival at the crime scene he interviewed eight to ten witnesses, including Mr. Johnson who provided him with the license plate number of the get-away vehicle. Based on this information, Detective Crumby was able to learn that the black, four-door Saturn used to flee the scene was registered to Mrs. Penelope Tafoya, the Defendant's mother. The Detective also stated that when Mr. Christopher Schultz turned himself in, he provided the information that eventually led to the discovery of the car at an apartment complex in Madison. When the police found the car, it had been washed and "wiped down" on the inside. No fingerprints were recovered, but a flyer advertizing a musical group, which had been distributed to all the vehicles in the parking lot of the Outer Limit the night of the murders, was found in the car.

On cross-examination, Detective Crumby stated that Mr. Johnson called and identified the Defendant as the shooter only after the Defendant was shown on television when he turned himself in. When questioned about the physical descriptions of the shooter he received from the witnesses, Detective Crumby stated that the descriptions were all "in line with each other" with regard to height, weight, clothing, hair color, hair style, and gender. Furthermore, the Detective testified that all the witness accounts described a similar sequence of events.

Officer Warren Fleak, of the Nashville Police Department Crime Scene Investigation Identification Unit, testified that he investigated and documented the crime scene, and collected and labeled evidence. He stated that he found twenty-eight .40 caliber shell casings and a nine-round magazine or clip from a Glock handgun.

Officer Charles Blackwood, Jr., of the Nashville Police Department Identification Unit, testified that he processed the victim's vehicle after it was towed to the police Field Office Building. The car's passenger window was shattered, and there were three projectile holes on the outside passenger side door and doorpost and "multiple" projectile holes throughout the interior of the vehicle. Officer Blackwood stated that he counted nineteen bullet strikes inside the vehicle, not counting those in the bodies of the two victims, and he removed twenty projectiles from the interior of the vehicle. Officer Blackwood also testified that he found the male victim laying across the front passenger side seat with his feet against the door and his head in the back seat. He found the female victim seated in the driver's seat.

Officer Kendall Yaeger, of the Nashville Police Department Forensic Section, was certified by the court as an expert in firearms and tool mark identification. Officer Yaeger testified that the empty shell casings removed from the scene were all .40 caliber, and the tool markings indicated that they had been fired by either a Glock or a Smith and Wesson. The grooves cut into the projectiles collected indicated that they had been fired by either a Glock, Heckler or Koch firearm. The empty Glock magazine recovered at the scene was capable of holding nine rounds. Officer Yaeger surmised that if only nine-round magazines were used,

11

to fire all twenty-eight shots the shooter would have had to start with one fully-loaded magazine and one round in the chamber, fire all ten rounds, then reload another nine-round magazine and fire all nine shots, then reload yet again and fire nine more times.

Dr. Feng Li, of the Medical Examiner's Office, was certified by the court as an expert in forensic pathology. He testified that he performed the autopsies on the two murder victims Dr. Li stated that Ms. Caruth suffered eight gunshot wounds, one of which entered her neck and passed through her brain. Dr. Li explained that any one of her multiple gunshot wounds were potentially fatal, especially the head wounds. Dr. Li testified that Ms. Caruth's "cause of death [was] multiple gunshot wounds." Dr. Li also testified that Mr. Campbell suffered sixteen gunshot wounds, including multiple wounds to the chest and one wound which severed his spinal cord. Dr. Li stated that Mr. Campbell's "cause of death [was] multiple gunshot wounds."

Pursuant to a stipulation of fact, evidence was admitted which stated that victim Monte Campbell received parole and was released from prison on August 8, 2002. After a brief jury-out discussion, Officer Christopher Steele, formerly of the Lewisburg Police Department, was allowed to testify. Officer Steele stated that he knew of victim Monty Campbell and the Defendant from a previous altercation that had occurred several years prior to the murders in the case at hand. Officer Steele stated that he had been present at a preliminary hearing for a home invasion case in which Mr. Campbell was the defendant, and the Defendant in this case was the victim. While standing in a hallway outside the courtroom, Officer Steele heard the Defendant state he was "going to get Mr. Campbell, get him back when he ... got out of jail." Officer Steele testified that he had heard victims blow off steam in such manner before, so he said to the Defendant, you do not mean that, to which the Defendant replied: "[n]o, I will get him back." Officer Steele stated that when he learned of the murders in this case and the parties involved, he contacted the Homicide Department of the Nashville Police Department. On cross-examination, Officer Steele admitted that at the time the statements were made he did not think anything of it, and he did not file a report about the incident.

The defense called Mr. Robert Sherrill, who testified that on the night of the murders he and the Defendant drove to the Outer Limit night club in his car, a Chevrolet Lumina, arriving shortly after midnight. He then stated that approximately one and a half hours before the shooting, the Defendant asked for the keys to his car, and left the club. Mr. Sherrill stated that friends later drove him home, and when he arrived home sometime after 3:00 am, the Defendant was at his house. On cross-examination, Mr. Sherrill admitted that he was close friends with the Defendant, and that he did not know where the Defendant was from 12:30 am, when the Defendant took the keys to his car, until 3:00 am, when he saw the Defendant at his house.

Ms. Quinisha Williams testified that in November of 2002, she and her children lived with Mr. Sherrill, and she knew the Defendant to be a friend of Mr. Sherrill. Ms. Williams stated

that she saw the Defendant on the night of the murders at approximately 1:20 am, which she remembered clearly because she had been resting on the couch when the Defendant let himself in to her home with a key. Ms. Williams was expecting Mr. Sherrill and noted the time on a clock near the door. Ms. Williams admitted that it was unusual for the Defendant to have a key to her home. Ms. Williams further testified that she and the Defendant then watched a movie until Mr. Sherrill returned home at approximately 3:00 am. On cross-examination, Ms. Williams admitted that she did not tell the police that the Defendant was with her at her home during the time the murders occurred. Ms. Williams explained that no one asked her, and so she did report her story until the Defendant's preliminary hearing, conducted some ten days after the crime took place.

Ms. Shadricka Bostick and Ms. Deandra Shelton testified that they, along with Ms. Wiggins, were in the parking lot the night of the murders and witnessed the shooting. Ms. Bostick described the shooter as "light-colored" with a low-cut hair style, and dressed in a black jacket. At trial, she clarified that he was a "light" man, mixed, white or black, but admitted that she had initially reported to the police that the shooter was a white man. Ms. Deandra Shelton stated that the shooter was a white male with short hair and a black leather jacket. She admitted that when she was shown a photographic lineup, she identified the wrong person. Ms. Shelton also stated that she never did see the shooter's face the night of the murders, but from what she did see, she initially believed it was a white male, but clarified at trial that it was also possible that the shooter was a light-complected African American male.

Mr. Christopher Schultz, who is a white male, testified at the trial that he shot the two victims. Mr. Schultz testified that he was a good friend of the Defendant, and that some of his property had been stolen by Mr. Campbell in the home invasion several years earlier. Mr. Shultz first stated that he arrived at the Outer Limit night club at 2:00 a.m. the night of the murders in his friend's dark blue Saturn. Mr. Schultz then testified that the Saturn was "primarily" his car, but that it was registered to the Defendant's mother because she had good credit and could get a car loan, and he made cash payments to her for the car. He also stated that other people, including the Defendant, frequently drove his car.

Mr. Shultz testified that on the night in question he was in the parking lot near the night club doing cocaine when he happened to see Mr. Campbell, whom he recognized as having stolen his property several years prior. The two "had a few words," and then Mr. Campbell walked over to a silver car and got into the passenger's side. Mr. Schultz stated that he had in his possession a Glock .40 caliber handgun and two extra clips, which he carried for protection from other drug dealers. Mr. Schultz walked over to the car that Mr. Campbell had just entered, and while he could not see into it due to window tinting, he started firing into the passenger side window "to kill Monty Campbell." Mr. Shultz first stated that he had four rounds in the gun when he started firing, but later testified that he initially had fourteen rounds, then reloaded and shot nine rounds, and then reloaded again and fired five more shots. Mr. Schultz testified that when the window fell in and he saw for the first time that

13

there was a woman in the car, whom he had accidently shot, it "made him even madder," and he fired more rounds, including more at Ms. Caruth because he believed she was trying to drive off. Mr. Shultz stated that he was wearing a black coat at the time of the shootings, and after he had finished he got into the Saturn and his friend, Earl, drove off.FN3 Mr. Schultz said he eventually disposed of the jacket he was wearing and threw the gun into the Cumberland river.

> FN3. The record reflects that Mr. Schultz stated to the police that his friend, Earl, had recently been killed and was therefore unavailable to corroborate his story.

Mr. Schultz pled guilty to two counts of first degree murder for his role in the crimes at issue in this case approximately one month before the Defendant's trial. At the Defendant's trial, Mr. Schultz explained that he initially told police that he was not the shooter, but subsequently changed his mind when "too many people were getting caught up in it that didn't have anything to do with it." He also stated that while he entered guilty pleas based on a stipulation of facts which stated that he was the driver and the Defendant was the shooter, he did so only because he did not know he could object to those facts and still plead guilty. At trial, Mr. Schultz insisted that the Defendant was not involved in the murders at issue in any way. However, on cross-examination he admitted that his entire first statement to the police was a lie, and he also lied in his second statement to the police when he stated he was alone in the get-away car.

Mr. David Spence, of the Southeastern Institute of Forensic Science, was certified as an expert in gunshot residue analysis and testified on behalf of the Defendant. Mr. Spence stated that he analyzed the black leather jacket that the Defendant had been wearing when he turned himself in after the murders, and he concluded that this jacket did not contain any gunshot residue particles. On cross-examination, Mr. Spence admitted that some guns produce less residue than others, that a "simple brushing or wiping" would remove residue particles, and that he had no way of knowing whether the jacket he tested was the same one worn by the shooter.

The State recalled Mr. Johnson as a rebuttal witness. Mr. Johnson testified that Mr. Schultz was too tall to be the shooter he saw, concluding that Mr. Schultz was "definitely not the shooter."

At the conclusion of the trial, the jury returned guilty verdicts on all three counts. The trial court merged the felony murder conviction for the killing of Ms. Caruth into the premeditated first degree murder conviction for the killing of Ms. Caruth, and a sentencing hearing was conducted, at the conclusion of which the jury found the Defendant should be sentenced to life without the possibility of parole for the murder of Ms. Caruth. The Defendant also received a concurrent life sentence for the first degree murder of Mr. Campbell. In April of 2004, the Defendant timely filed a motion for new trial, and in January of 2005, he filed an amended motion for new trial. Following a hearing, the trial court denied

the Defendant's motion. This appeal followed.

2006 WL 264631, at **1-6 (citations omitted). The State courts' other factual findings are presented in connection with Petitioner's specific claims.

### D. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412. In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state-court convictions

15

are given effect to the extent possible under the law."

Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "'state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.'" Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).The Supreme Court reiterated that "we have made clear that whether a state court decision was unreasonable must be assessed **in light of the record the court had before it**". Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added).

In Greene v. Fisher, 565 U.S. __, 132 S. Ct. 38, 42 (2011), the Supreme Court considered whether "'clearly established Federal law' includes decisions of th[e] [Supreme] Court that are announced after the last adjudications of the merits in state court but before the defendant's conviction becomes final" and answered the question in the affirmative. There, a Supreme Court decision at issue was rendered two months after the state supreme court upheld the petitioner's convictions. Id. at 43. The Supreme Court held that its decision was not clearly established at the time of the state supreme court's decision. Id. at 44-45. The Supreme Court noted a different result

16

if the petitioner had applied for the writ of certiorari or had filed a state post-conviction petition. Id. at 45.

The district court also "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

### 1. Petitioner's Exhausted Ineffective Assistance of Counsel Claims

Petitioner presented the following ineffective assistance of counsel claims in his State post conviction appeal, namely that his trial counsel was ineffective

> **by failing to object to or appeal "the issue of the constructive amendment of count one of the indictment," failing to "raise the issue of the affidavit containing fraudulent misrepresentation of material facts which made the arrest unlawful for lack of probable cause," and failing to "raise and appeal the state's knowing use of false testimony."** Counsel was appointed to represent Petitioner, and an amended post-conviction petition was filed, alleging additional grounds of ineffectiveness, including **failing to call Detective Putnam to impeach eyewitnesses' testimony which differed from their prior statements; failing to call jail employees and attorneys who heard co-defendant Schultz confess to the murders; failing to present expert testimony on eyewitness identification; failing to request a jury view of the crime scene; failing to use crime scene photographs to establish the "extreme distance between the witnesses' location and the actual scene of the shootings"; failing to call Petitioner's mother, Penelope Tafoya, to testify that the Saturn belonged to Schultz, not Petitioner; failing to allow Petitioner to testify that he was innocent and had moved to Nashville to avoid further trouble with victim Campbell; failing to adequately cross-examine Officer Steele regarding a threat Petitioner allegedly made against victim Campbell; and by failing to argue about the lack of premeditation in the killing of victim Caruth.**

Tyler, 2010 WL 2025459 at *1.

For these claims, the Tennessee Court of Criminal Appeals made the following findings

of fact on the actionable claims in this action:

At the post-conviction hearing, Officer Steele testified that he heard Petitioner threaten that he would "get" victim Campbell years prior to the murders. Officer Steele conceded that the threat could have been made to someone other than the victim. Officer Steele stated that at trial he was not asked to clarify to whom the threat was directed. Nevertheless, Officer Steele said that when he heard victim Campbell had been killed, he immediately recalled the threat and thought Petitioner might be the perpetrator.

Christopher Schultz testified that prior to his guilty pleas, he informed attorneys Justin Johnson, Jonathan Wing, and Jonathan Farmer that he was the shooter and that Petitioner was not involved in the murders. Schultz said that he and victim Campbell went to school together before the shooting and that his home was burglarized by Campbell. Schultz said he informed his attorney, Wing, that he did not want to accept a guilty plea unless the factual stipulation provided that he was the shooter and that Petitioner was not involved in the murders. However, at the guilty plea hearing, the stipulated facts provided that Petitioner was the shooter and that Schultz was the getaway driver. Schultz said, "That must have been my attorney's fault because I never agreed to that, knowingly and willingly." Schultz stated that he remembered being cross-examined about his guilty pleas at Petitioner's trial.

Jonathan Wing, Schultz's trial attorney, testified that Schultz never wavered from his insistence that he was the shooter and that Petitioner was not involved in the murders. However, Wing stated that he was more inclined to believe the State's theory of the case than the version of events expounded by Schultz, noting that the proof was not consistent with Schultz's claims. Wing noted that Schultz lied in his first two statements to police. Wing said that he did not know why Schultz wanted to be considered the shooter and that he tried to explain to Schultz that even though there was no legal difference, "it's better to be the driver than to be the actual shooter in terms of trial, in terms of the situation." Wing said he could not recall if Petitioner's trial counsel contacted Schultz but would be surprised if it did not happen. Wing stated that he was not called to testify at Petitioner's trial regarding Schultz claiming to be the shooter.

Justin Johnson testified that he represented Petitioner at the preliminary hearing in general sessions court. Schultz told Johnson he was the shooter. Justin Johnson made sure that Schultz knew he was Petitioner's attorney and that Schultz's statement was thus not protected by attorney-client privilege. Because Schultz confessed to him, Justin Johnson believed he might be called as a witness; therefore, he withdrew from representing Petitioner. He told both Wing and Petitioner's trial counsel about Schultz's statement. However, he was never called as a witness at Petitioner's trial.

Penelope Tafoya, Petitioner's mother, testified that although she and trial counsel discussed her being called as a witness at Petitioner's trial, she was never called. She said she would have testified that although the Saturn was registered in her name, she had purchased the car for Schultz because her credit was better; however, Schultz made the payments on the car. Ms. Tafoya said she never had control of the car, and it belonged to Schultz. She stated that she and Petitioner were "very close" to Schultz; he was Petitioner's friend and was like another son to her.

Petitioner testified that trial counsel should have called Detective Putnam to testify at trial. He explained that Detective Putnam interviewed witnesses at the scene and that his supplemental reports differed from those of other detectives.FN2 Petitioner believed Detective Putnam could have emphasized discrepancies in the witnesses' descriptions of the shooter.

> FN2. Petitioner was represented by three attorneys at trial; however, all of Petitioner's ineffective assistance claims relate to his lead trial counsel.

Petitioner asserted that trial counsel failed to call corrections officers or counselors who heard Schultz say he was the shooter. Petitioner opined that the testimony of the officers could have bolstered Schultz's credibility. Petitioner also complained that trial counsel did not sufficiently investigate Schultz's claim that he was accompanied by Earl Shannon, not Petitioner, on the night of the murders, maintaining that the Petitioner and Shannon "resemble a little bit." Petitioner said that Shannon was killed in Detroit and could not be called as a witness at his trial.

\*                          \*                          \*

Petitioner said the Saturn used to tie him to the crimes belonged to Schultz, but he acknowledged that he had driven the car on occasion. He stated that counsel should have called Ms. Tafoya as a witness to explain that although the car was registered in her name, the car belonged to Schultz.

Petitioner maintained that trial counsel did not adequately cross-examine Officer Steele regarding his "false and misleading testimony" that Petitioner threatened Campbell. Petitioner denied making the threat; however, he said that even if the statement had been made, Officer Steele could not have determined that it was directed to Campbell because the other co-defendants were also in the courtroom. Petitioner said that if other officers were in the courtroom, trial counsel should have investigated to see if anyone else heard the statement. Petitioner said he moved to Nashville after the home invasion because he was "trying to get away from that whole situation." Petitioner stated that he did not know Campbell would be at the Outer Limit nightclub, explaining that he did not know Campbell was out of jail. Petitioner said Schultz's property was also taken during the home invasion, and he opined Schultz killed Campbell for that reason.

19

Petitioner's trial counsel testified that he was appointed to represent Petitioner at his arraignment. Trial counsel said he was aware Schultz had stated on multiple occasions that he, not Petitioner, was the shooter. In fact, trial counsel had conversations with Wing and Justin Johnson regarding Schultz's claim. Counsel stated that at Petitioner's trial, Schultz testified he was the shooter, and the jury saw a videotape on which Schultz stated he was the shooter. Trial counsel believed the testimony and the videotape were "pretty moving" and "pretty convincing." Trial counsel noted that when the videotaped statement was played, victim Caruth's father commented, "[Y]ou've killed my daughter" and was removed from the courtroom. Trial counsel opined that the family member's reaction lent credence to Schultz's testimony that he was the shooter. However, the State cross-examined Schultz regarding the facts stipulated to at his guilty plea proceeding, which provided that Petitioner was the shooter. Trial counsel said he did not call additional witnesses to bolster Schultz's credibility with his prior consistent statements because he felt Schultz's testimony was sufficient.

Trial counsel stated that Schultz claimed to be with Earl Shannon at the time of the murders. Prior to trial, counsel learned Shannon had died, but he obtained a picture of Shannon for Schultz to identify at trial.

Trial counsel said he did not call Ms. Tafoya as a witness to corroborate Schultz's testimony that he owned the car because he was trying to put "distance" between Petitioner and Schultz. Counsel thought that if Ms. Tafoya testified, the jury would see the close ties between Petitioner's family and Schultz. Counsel noted that Petitioner and Schultz lived together and that Petitioner occasionally drove Schultz's car.

Trial counsel said that he cross-examined the young women who testified at Petitioner's trial regarding the inconsistencies in their descriptions of the shooter at trial and the descriptions they initially gave police. Trial counsel questioned Jared Johnson about the distance from which he claimed to have seen the shooter. Trial counsel did not believe Jared Johnson's testimony was coerced, but he believed the witness was mistaken. Counsel opined that Jared Johnson was a "showboater" who was "getting his fifteen minutes of fame" and "wanted to be the hero." Counsel stated that Jared Johnson's testimony, which the jury obviously believed, was "critical" proof against Petitioner.

Trial counsel acknowledged that the proof adduced at trial revealed that neither Petitioner nor Schultz knew victim Caruth and that she was an innocent bystander. Regardless, counsel stated that the proof revealed victim Caruth would have been clearly visible to the shooter by the time he reloaded and resumed shooting. Counsel said the defense strategy was to show that Petitioner was not present or involved in the murders; therefore,

they did not challenge premeditation.

*       *       *.

Trial counsel said he was aware prior to trial that Officer Steele would testify regarding a statement Petitioner made about victim Campbell. Trial counsel acknowledged he did not interview anyone who may have heard the statement, anyone who could corroborate Officer Steele's testimony, or the other participants in the home invasion to see if they had received any threats or had encountered problems with Petitioner since their convictions. Trial counsel conceded that he did not ask Officer Steele to whom Petitioner directed his threat. He said his understanding of Officer Steele's testimony was that the threat was directed toward Campbell.

*       *       *

Trial counsel did not recall making a conscious decision to not call Detective Putnam regarding the variances in the witnesses' descriptions of the shooter at trial and the descriptions initially given to police. Regardless, trial counsel stated that it would have been obvious to the jury that he cross-examined witnesses from police reports and that he was able to elicit testimony regarding the varying descriptions of the shooter.

Tyler, 2010 WL 2025459 at **2-5. The Court addresses those claims that were timely filed.

### a. The Steele Testimony and Campbell Threat Claims

According to Petitioner, his trial counsel failed to examine Officer Steele about a threat that Mr. Tyler allegedly made toward Monte Campbell at a preliminary hearing on Campbell's burglary charge. At trial, Officer Steele testified that Petitioner attended Campbell's preliminary hearing and told a group of persons present that Petitioner was going to "get him [Campbell]." (Docket Entry No. 14 at 21). At the post-conviction hearing, Officer Steele testified that if asked at trial, he would have responded that multiple people were involved in the burglary and that he did not consider the threat serious. In response to Steel's testimony that Petitioner's statement could have referred to an individual other than Campbell, Petitioner's trial counsel testified that "I think that would have been a good question[:] Whether or not [the threat] was

21

specifically, to Monte Campbell or not." Id. at 22. At the post-conviction hearing, Officer Steele testified that he heard Petitioner threaten that he would "get" victim Campbell years prior to the murders. Officer Steele conceded that the threat could have been made to someone other than the victim. Officer Steele stated that at trial he was not asked to clarify to whom the threat was directed. Nevertheless, Officer Steele said that when he heard victim Campbell had been killed, he immediately recalled the threat and thought Petitioner might be the perpetrator. Tyler, 2010 WL 2025459, at *2.

In addition, the Tennessee court found that " Trial counsel said he was aware prior to trial that Officer Steele would testify regarding a statement Petitioner made about victim Campbell. Trial counsel acknowledged he did not interview anyone who may have heard the statement, anyone who could corroborate Officer Steele's testimony, or the other participants in the home invasion to see if they had received any threats or had encountered problems with Petitioner since their convictions. Trial counsel conceded that he did not ask Officer Steele to whom Petitioner directed his threat. He said his understanding of Officer Steele's testimony was that the threat was directed toward Campbell." Id. at *5.

On these claims, the Tennessee appellate court found a lack of prejudice for trial counsel's cited omission

> Regarding Petitioner's complaints about trial counsel's approach to Officer Steele's testimony, the post-conviction court found that the cross-examination of Officer Steele "forced Officer Steele to admit that he believed the Petitioner's statements were not serious threats and that the statements were not serious enough to elicit bringing the Petitioner in for questioning or to write a report on the incident." Counsel maintained that based upon the information he had, he understood that the threat referred only to Campbell. Moreover, regarding Petitioner's complaint that trial court did not investigate whether anyone else heard the threats, we note that **Petitioner failed to present any witnesses at the post-conviction hearing**

**who heard the threat or would testify that Petitioner made no such comment.
Generally, "[w]hen a petitioner contends that trial counsel failed to discover,
interview, or present witnesses in support of his defense, these witnesses
should be presented by the petitioner at the evidentiary hearing."** Black v.
State, 794 S.W.2d 752, 757 (Tenn.Crim.App.1990). **We may not speculate on
what benefit these witnesses might have offered to Petitioner's case, nor may
we guess as to what evidence further investigation may have uncovered.** Id.
**Accordingly, Petitioner has failed to demonstrate prejudice in this regard.**

Tyler, 2010 WL 2025459 at * 6.

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the

totality of the circumstances, his trial counsel performed deficiently and that counsel's

performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). As the

Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

Id.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains

simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland,

"counsel has a duty to make reasonable investigations or to make a reasonable decision that

makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty
> to investigate, the duty at issue in this case. As the Court of Appeals concluded,
> strategic choices made after thorough investigation of law and facts relevant to
> plausible options are virtually unchallengeable; and strategic choices after less
> than complete investigation are reasonable precisely to the extent that reasonable
> professional judgments support the limitations on investigation. In other words,
> counsel has a duty to make reasonable investigations or to make a reasonable

decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id at 690-91.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691. Counsel's failure "'to conduct [] constitutionally adequate pretrial investigation into potential mitigation evidence'" can "'hamper[] [their] ability to make strategic choices.'" Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005) (citation omitted). A court must examine not only the individual errors of counsel, but must also view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, No.

24

98-1616, 2000 WL 712376, at *4 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a reasonable probability "'that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Williams, 529 U.S. at 390-91 (citations omitted). In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694.

On the Campbell threat and Steele's testimony, the Tennessee appellate court ruled that in the absence of witnesses to testify that they heard the threat and/or that the threat was directed at a person other than Campbell, Petitioner had failed to demonstrate prejudice in the cited omission of his trial counsel. Although Steele's modification of trial testimony would have been beneficial if elicited at trial and considering the State's other proof at trial, this Court concludes that the State courts could reasonably determine that Petitioner has not demonstrated that the requisite prejudice under Strickland so as to warrant relief on these claims.

### b. Failure to Call Tafoya as Defense Witness

For this claim, Petitioner asserts that his trial counsel was ineffective for failing to call Penelope Tafoya, Petitioner's mother, to respond to the State's proof that the Saturn involved in the shooting was registered to Petitioner's mother. According to Petitioner, "the Saturn used to tie him to the crimes belonged to Schultz, but he acknowledged that he had driven the car on occasion. He stated that counsel should have called Ms. Tafoya as a witness to explain that although the car was registered in her name, the car belonged to Schultz. Tyler, 2010 WL

25

2025459 at *3. For this claim, Petitioner cites Christopher Schultz's testimony that he was close with Ms. Tafoya who helped him in the purchase of the Saturn vehicle. Petitioner contends that Ms. Tafoya would have testified that although she helped Schultz purchase the Saturn, the Saturn belonged to Schultz, as Petitioner's defense contended. Petitioner states that Ms. Tafoya was outside of the courtroom for much of Petitioner's trial, but his trial counsel did not call her as a defense witness to bolster the credibility of Schultz and the defense trial theory.

The State court's factual findings on this claim were that "Tafoya, Petitioner's mother, testified that although she and trial counsel discussed her being called as a witness at Petitioner's trial, she was never called. She said she would have testified that although the Saturn was registered in her name, she had purchased the car for Schultz because her credit was better; however, Schultz made the payments on the car. Ms. Tafoya said she never had control of the car, and it belonged to Schultz. She stated that she and Petitioner were 'very close' to Schultz; he was Petitioner's friend and was like another son to her." Tyler, 2010 WL 2025459 at *3. As to why he did not call Tafoya as a defense witness: "Trial counsel said he did not call Ms. Tafoya as a witness to corroborate Schultz's testimony that he owned the car because he was trying to put 'distance' between Petitioner and Schultz. Counsel thought that if Ms. Tafoya testified, the jury would see the close ties between Petitioner's family and Schultz. Counsel noted that Petitioner and Schultz lived together and that Petitioner occasionally drove Schultz's car." Id. at *4.

On this claim, the Tennessee appellate court cited the trial court's finding that the issue of calling witnesses was a strategic decision of counsel who believed the other proof at trial was sufficient to show the ownership of the vehicle and also found the lack of prejudice from counsel's cited omission on this witness.

> Regarding Petitioner's complaints that trial counsel failure to call Ms. Tafoya to testify that Schultz owned the Saturn, **the post-conviction court found that counsel did not call Ms. Tafoya because he felt Schultz's testimony about the vehicle was sufficient and because he did not want to risk the jury discovering that Schultz and Petitioner's family were close. The post-conviction court found that counsel's decision was a reasonable strategy.** ... . On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20–20 hindsight." State v. Hellard, 629 S.W.2d 4, 9 (Tenn.1982). **Petitioner failed to prove prejudice relating to this issue.**

Id. at *7.

The state courts could reasonably conclude that the selection of witnesses for trial was a strategic decision of Petitioner's counsel. First, Petitioner's trial counsel interviewed Tafoya and learned of her close personal ties to Schultz. In addition, the other proof at trial about the ownership of the Saturn vehicle provides support for Petitioner's trial counsel's assessment of the need to call Ms. Tafoya who had close personal ties to Schultz. In this context, the State courts' decisions are not unreasonable applications of Strickland that requires a strong presumption of correctness to trial counsel's strategic decisions.

### c. Failure to Call Putnam and Prison Employees as Defense Witnesses

In his post conviction appeal and in his pro se petition in this action, Petitioner cites his trial counsel's failure to call Detective Putnam, an interviewer of the witnesses to the shooting, as a witness. According to Petitioner "Detective Putnam interviewed witnesses at the scene and that his supplemental reports differed from those of other detectives. Petitioner believed Detective Putnam could have emphasized discrepancies in the witnesses' descriptions of the shooter." Tyler, 2010 WL 2025459 at *3. On this point, the Tennessee appellate court found that "Trial counsel did not recall making a conscious decision to not call Detective Putnam regarding the variances in the witnesses' descriptions of the shooter at trial and the descriptions initially given

to police. Regardless, trial counsel stated that it would have been obvious to the jury that he cross-examined witnesses from police reports and that he was able to elicit testimony regarding the varying descriptions of the shooter". Id at *5. Yet, "Trial counsel said that he cross-examined the young women who testified at Petitioner's trial regarding the inconsistencies in their descriptions of the shooter at trial and the descriptions they initially gave police." Id. at *4.

Based upon these facts, the Tennessee appellate court found trial counsel's use of police reports to elicit the cited inconsistencies of the witnesses to preclude any finding of prejudice for trial counsel's failure to call Putnam as a witness.

> **Additionally, we note that the post-conviction court found trial counsel's decision not to call Detective Putnam to testify about the variance in the witnesses' descriptions of the shooter was reasonable, especially in light of counsel's testimony that he used police reports to cross-examine the witnesses and establish the inconsistencies in the witnesses' descriptions of the shooter. The trial court found that trial counsel brought out the inconsistencies and that trial counsel's strategy was not unreasonable.** On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20–20 hindsight." State v. Hellard, 629 S.W.2d 4, 9 (Tenn.1982). **Petitioner failed to prove prejudice relating to this issue.**

Id. at *7 (emphasis added).

The Court agrees that calling Detective Putnam to describe the witnesses' inconsistencies may be a more desirable method to present these inconsistencies. Yet, the undisputed fact that the cited inconsistencies of the witnesses whom Putnam interviewed were presented to the jury through the use of police reports provides a reasoned basis for the Tennessee appellate court to find a lack of prejudice. Strickland counsels against employing hindsight to judge trial counsel's decision. For these reasons, the Court concludes that the Tennessee courts reasonably decided this claim under Strickland.

28

### d. Failure to Call John Wing

For this claim, Petitioner asserts that his trial counsel rendered ineffective assistance by failing to call Jonathan Wing, counsel for Schultz, who testified that he was the shooter and that Petitioner was not involved with the crimes. Yet, on cross examination, the State elicited from Schultz that in his initial statement to the police officers Schultz denied any involvement in the shooting. Thus, Petitioner contends that Petitioner's trial counsel could have called Wing to bolster Schultz's testimony. Although Wing testified in an offer of proof by the State, Petitioner asserts that Wing would have testified that during his representation of Schultz, Schultz was "very adamant" that he was the shooter and that Petitioner was not involved. On this point, Wing would have stated that Schultz "never wavered." (Docket Entry No. 14, Amended Petition at 16). Petitioner also cites Wing's availability for the majority of the trial.

To evaluate Wing's testimony requires consideration of Schultz's testimony:

> Christopher Schultz testified that prior to his guilty pleas, he informed attorneys Justin Johnson, Jonathan Wing, and Jonathan Farmer that he was the shooter and that Petitioner was not involved in the murders. Schultz said that he and victim Campbell went to school together before the shooting and that his home was burglarized by Campbell. Schultz said he informed his attorney, Wing, that he did not want to accept a guilty plea unless the factual stipulation provided that he was the shooter and that Petitioner was not involved in the murders. However, at the guilty plea hearing, the stipulated facts provided that Petitioner was the shooter and that Schultz was the getaway driver. Schultz said, "That must have been my attorney's fault because I never agreed to that, knowingly and willingly." Schultz stated that he remembered being cross-examined about his guilty pleas at Petitioner's trial.

Tyler, 2010 WL 2025459 at *2.

The Tennessee appellate court's findings of fact about the Wing testimony were as follows:

> Jonathan Wing, Schultz's trial attorney, testified that Schultz never wavered from

his insistence that he was the shooter and that Petitioner was not involved in the murders. However, Wing stated that he was more inclined to believe the State's theory of the case than the version of events expounded by Schultz, noting that the proof was not consistent with Schultz's claims. Wing noted that Schultz lied in his first two statements to police. Wing said that he did not know why Schultz wanted to be considered the shooter and that he tried to explain to Schultz that even though there was no legal difference, "it's better to be the driver than to be the actual shooter in terms of trial, in terms of the situation." Wing said he could not recall if Petitioner's trial counsel contacted Schultz but would be surprised if it did not happen. Wing stated that he was not called to testify at Petitioner's trial regarding Schultz claiming to be the shooter.

Tyler, 2010 WL 2025459 at *2.

As to Petitioner's trial counsel's assessment of Schultz's testimony, the Tennessee

appellate court found that

Petitioner's trial counsel testified that he was appointed to represent Petitioner at his arraignment. Trial counsel said he was aware Schultz had stated on multiple occasions that he, not Petitioner, was the shooter. In fact, trial counsel had conversations with Wing and Justin Johnson regarding Schultz's claim. Counsel stated that at Petitioner's trial, Schultz testified he was the shooter, and the jury saw a videotape on which Schultz stated he was the shooter. Trial counsel believed the testimony and the videotape were "pretty moving" and "pretty convincing." Trial counsel noted that when the videotaped statement was played, victim Caruth's father commented, "[Y]ou've killed my daughter" and was removed from the courtroom. Trial counsel opined that the family member's reaction lent credence to Schultz's testimony that he was the shooter. However, the State cross-examined Schultz regarding the facts stipulated to at his guilty plea proceeding, which provided that Petitioner was the shooter. Trial counsel said he did not call additional witnesses to bolster Schultz's credibility with his prior consistent statements because he felt Schultz's testimony was sufficient. Trial counsel stated that Schultz claimed to be with Earl Shannon at the time of the murders. Prior to trial, counsel learned Shannon had died, but he obtained a picture of Shannon for Schultz to identify at trial.

Id. at *4.

Based upon these facts, the Tennessee appellate court ruled that as a matter of strategy,

Petitioner's trial counsel reasonably decided not to call Wing.

Petitioner also contends that trial counsel was ineffective by failing to call Wing

and Justin Johnson to bolster Schultz's credibility. The post-conviction court noted that Schultz's credibility was a major issue at trial and that his credibility was "severely damaged by the self-serving facts adopted into his plea testimony and by his statements to police—all suggesting that he was not the shooter." **The court found that introducing evidence of prior consistent statements would not have negated the presence of the inconsistent statements. Therefore, the court found that Petitioner was not prejudiced by counsel's failure to call witnesses to testify regarding Schultz's prior consistent statements. The record does not preponderate against this finding.**

Id. at *7.

Upon consideration of the State courts' findings of fact on this claim, the Court is unable to conclude that the Tennessee courts' decision on this claim was reasonable. Here, the State courts found that "Schultz's credibility was a major issue at trial." Id. at *7. Petitioner's counsel interviewed Wing and also had proof of his testimony. Wing's testimony would clearly have negated the effect of Schutlz's prior inconsistent statements by demonstrating Schultz's consistent statements to his counsel that he was the shooter. According to Wing, Schultz "never wavered" in his statements that he was the shooter. Id. at *2. Where the critical issue is whether Petitioner or Schultz shot the victim and Schultz's credibility is the major issue at trial, then any proof that was consistent with Petitioner's innocence would be Petitioner's counsel's obligation to present and let the jury assess the credibility of the witnesses. Without Wing's testimony, the jury did not have the benefit of proof that Schultz was truthful in his testimony, as reflected by his consistent statements to his counsel. Without this proof, the Court cannot be assured as to what the jury's verdict may have been.

Under Strickland, prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466

31

U. S. at 694. The Sixth Circuit found prejudice under <u>Strickland</u> in similar factual circumstances:

> In the end, weighing the prosecution's case against the proposed witness testimony is at the heart of the ultimate question of the <u>Strickland</u> prejudice prong, and thus it is a mixed question of law and fact not within the Section 2254(e)(1) presumption. **Even though the jury could have discredited the potential witnesses here based on factors such as bias and inconsistencies in their respective stories, there certainly remained a reasonable probability that the jury would not have. Ramonez's case was therefore prejudiced where their testimony would have helped corroborate his testimony and contradict that of complaining witness** Fox (<u>see</u> <u>Workman v. Tate</u>, 957 F.2d 1339, 1346 (6th Cir.1992)), but **where counsel's default in carrying out his constitutional obligations resulted in that testimony not being introduced at trial. All it would have taken is for "one juror [to] have struck a different balance" between the competing stories.**

<u>Ramonez v. Berghuis</u>, 490 F.3d 482, 491 (6th Cir. 2007) (emphasis added) (quoting <u>Wiggins v. Smith</u>, 539 U.S. 510, 536 (2003)).

Here, if a single member of the jury believed Shultz and Wing that Schultz shot the victim, then the verdict would have been different. Thus, the Court is unable to conclude that the Tennessee courts' assessment of this claim is reasonable as to Petitioner's counsel performance or the prejudicial effect of his failure to call Wing as a witness.

For these reasons, the Court concludes that Petitioner's claims should be denied as time barred or meritless except for his claim that his trial counsel failed to call Wing as a witness. For that latter claim, the writ should be granted and the State would have 120 days to retry the Petitioner.

An appropriate Order is filed herewith.

**ENTERED** this the ___ day of July, 2014.

William J. Haynes Jr.
Chief United States District Judge